J. J. WHITE LUMBER COMPANY *v.* McCOMB CITY
TURPENTINE COMPANY.

[71 South.  5.]

1. LANDLORD AND TENANT. *Turpentine leases. Actions. Evidence. De-
ficiency in leased lands. Recovery. Burden of proof. Timber
leases. Construction.*

When the lessee of timber lands claimed that there was a deficiency
of acreage under his contract, it had the burden of showing the
amount of the shortage.

2. LANDLORD AND TENANT. *Timber lease. Construction.*

Where defendant leased to complainant lands for the purpose of
turpentining, which were described as containing approximately
six thousand, nine hundred and thirteen acres of timber and the
contract of lease recited that the lessee might box for turpentine
purposes all merchantable pine timber, and that the term "mer-
chantible pine timber" should mean any tree of sufficient size
to square not less than four inches.  In such case in view of
other provisions for turpentine a fixed number of acres each year
and for the location by the lessor of the lands to be turpentined
yearly, the lessor was not bound to furnish virgin timber of the
acerage specified.

3. LANDLORD AND TENANT. *Timber leases. Construction. Deficiency.*

Under the facts in this case, the contract of lease was a contract in
gross or in bulk, so that no recovery for shortage in the acreage
of the timber could be maintained where the shortage did not
amount to deception or fraud.

APPEAL from the chancery court of Pike county.
HON. R. B. MAYES, Special Chancellor.

Bill by the McComb City Turpentine Company against
J. J. White Lumber Company.  From a decree for com-
plainant, defendant appeals.

The facts are fully stated in the opinion of the court.

*J. S. Sexton* and *W. B. Mixon,* for appellant.

*Price & Price* and *Jr. Talley,* for appellee.

Holden, J., delivered the opinion of the court.

This is an appeal from a decree of the chancery court of Pike county, Hon. Robert B. Mayes, special chancellor. The appellee, McComb City Turpentine Company, complainant in the court below, filed its bill, claiming, among other things, that the appellant, J. J. White Lumber Company, defendant below, leased to appellee, through Carr Bros., for turpentine purposes, six thousand, nine hundred and thirteen acres of merchantable pine timber, suitable for turpentine purposes, for which it paid appellant twenty-five thousand, fifteen dollars and eighty cents, and that appellant failed to deliver the quantity, six thousand, nine hundred and thirteen acres of pine timber as contracted; that the shortage in the delivery amounted to one thousand, four hundred and eleven acres, which was a breach of the contract—and seeking to recover the purchase price and damages of appellant therefor. The lumber company, defendant below, answered, and, among other things, contended that appellee could not recover for the alleged shortage of one thousand, four hundred and eleven acres, for two reasons: First, that as a matter of fact, under the contract of lease, there is no shortage of one thousand, four hundred and eleven acres, or any amount whatever, and if there be any shortage at all, it is inconsiderable; second, that the contract of lease is a contract "in bulk" or "in gross," and that the shortage or variation, if any, is allowable to the lessor, under the contract here involved. There was a decree in favor of appellee as to the shortage of one thousand four hundred and eleven acres, and for other damages claimed in the bill, and appellant prosecutes this appeal. We here set out the material parts of the contract involved:

This contract and agreement made and entered into in duplicate this the 27 day of October, A. D. 1905, by and between the J. J. White Lumber Company, a corporation existing under the laws of the state of Mississippi,

110 Miss.—54

herein called the party of the first part, and Carr Bros., composed of the individuals J. A. Carr and A. S. Carr, partners of Hattiesburg, Miss., hereinafter called the parties of the second part. Witnesseth: The party of the first part for and in consideration of the rent hereinafter reserved to be paid and the covenants to be performed by the parties of the second part, does by these presents hereby demise, farm, let and lease unto the said parties of the second part, their heirs or assigns all of the pine timber suitable for turpentining purposes located on the lands hereinafter described, which lands are owned by the party of the first part, and all of the merchantable pine timber suitable for turpentining purposes on the lands hereinafter described, upon which the party of the first part owns on them merchantable pine timber to wit:

| | Sec. | Acres. |
|---|---|---|
| S ½ of S ½ | 22 | 120 |
| S ½ of S ½ | 23 | 150 |
| W½ of NE ¼, SW ¼, W ½ of SE ¼, and SE ¼ of SE ¼ | 25 | 340 |
| All on section | 26 | 480 |
| All on section | 27 | 520 |
| S½ of NE ¼ | 28⎱ | 400 |
| S ½ | 28⎰ | |
| E ½ of SE ¼ | 29 | 80 |
| SE ¼ | 31 | 50 |
| S ½ | 32 | 200 |
| All on | 33 | 630 |
| N ½ and N ½ of SE ¼ | 34⎱ | 360 |
| N ½ of NW ¼ of SW ¼ | 34⎰ | |
| N ½ and N ½ of S ½ | 35⎱ | 560 |
| SW ¼ of SW ¼ and S ½ of SE ¼ | 35⎰ | |
| W ½ of N ½ and S ½ of NW ¼ | 36⎱ | 360 |
| SW ¼ of NE ¼ and N ½ of SE ¼ | 36⎰ | |

All in Township One (1) North of Range Six (6) East, Amite county, Miss.

| | | |
|---|---|---|
| NE ¼ and NW ¼ of NW ¼ | 31 ⎫ | |
| S ½ of NW ¼, E ½ of SW ¼, and W ½ of SE ¼ | 31 ⎬ | 440 |
|     Township One (1) North of Range 7 East, Pike County, Mississippi. | | |
| N ½ of NW ¼ and SW ¼ of NW ¼ | 1 | 120 |
| NE ¼ of NW ¼, E ½ of NW ¼ of NW ¼ | 12 | 50 |
|     Township One (1) South, Range Six (6) East, Tangipahoa Parish Louisiana. | | |
| S ½ of NE ¼, E ½ of NW ¼, and E ½ of W ½ of NE ¼ | 2 ⎫ | 400 |
| SW ¼, NW ¼ of SE ¼ | 2 ⎭ | |
| E ½ of SW ¼ of SE ¼ | 3 | 16 |
| SE ¼ of NE ¼ and NE ¼ of SE ¼ | 9 | 40 |
| NE ¼, S ½ of NW ¼, and NW ¼ of SW ¼ | 10 | 220 |
| SW ¼ of NW ¼ and NW ¼ of SW ¼ | 11 | 40 |
| W ½ of N ¼ | 4 | 50 |
| N ½ of NE ¼ and S ½ of SE ¼ | 5 | 60 |
| All in section | 37 | 437 |
| W ½ of NW ¼ | 6 | 40 |
| NW ¼ of NW ¼, N ½ of SW ¼ of NW¼ and SE ¼ of NE ¼, and fraction of SE ¼ | 7 | 165 |
| N ½ of NW ¼, SW ¼ of NW ¼, and fraction of SW ¼ | 8 | 122 |
| Ninety acres on the N ½, N and W sides | 38 | 90 |
|     Township One (1) South, Range Six (6) East, St. Helena Parish, Louisiana. | | |
| Lots 1, 2 and 3 | 1 | 70 |
| And fractional NE corner of the George Gordon section 55 to make 90 acres with lot 1 of | 1 | 90 |
| Fraction E ½ of NW ¼ of NE ¼ and NE ¼ of NE ¼ | 12 | 40 |
| Fractional SE corner | 56 | 20 |
| Fractional east side section 37 | | 143 |

Township, One(1) South of Range Five (5), St. Helena Parish, Louisiana. —being in all approximately six thousand, nine hundred and thirteen acres of timbered land.

It is understood and agreed by this contract,

First. That the term merchantable pine timber shall mean any pine tree of sufficient size to square not less than four inches (4″) by four inches (4″).

Second. That the parties of the second part hereby pay unto the party of the first part the sum of five thousand dollars ($5,000.) to bind this contract, receipt whereof is hereby acknowledged, the balance or deferred payments to twenty thousand, fifteen & $^{80}/_{100}$ ($20,015.80), making the total amount to be paid for the lease of the aforesaid lands for turpentining purposes at the rate of three dollars and sixty cents per acre, to be paid by the parties of the second part to the party of the first part on or before the first day of December, A. D. 1905.

Third. For the above consideration the party of the first part conveys and warrants to the parties of the second part their heirs or assigns the right to enter upon said lands, to box, work and use for turpentine purposes the aforesaid pine timber for the purpose of producing and manufacturing resin and spirits of turpentine for the full end and term of three (3) years from the date of entry thereon as hereinafter provided or until the third crop of turpentine is gathered from the said pine timber.

Fourth. It is agreed and understood that the party of the second part shall not commence operation upon said land before the first day of January 1907, and may box for turpentine purposes not more than fifteen hundred acres (1500) of said timber each year or turpentine season during the life of this contract, except that should the parties hereafter agree to use more or less of said timber each year, the same shall be agreed to in writing. Provided, however, that on January the first, 1910, that the said party of the first part shall have the right to proceed

to take the timber from not exceeding one thousand, five hundred acres of said lands during the year 1910 and not to exceed one thousand, five hundred acres during each year thereafter; during the life of this contract.

Fifth. The party of the first part shall on or before the first day of November in each year, locate and designate the land upon which the pine timber shall be turpentined for the first time during the next twelve months and furnish to the parties of the second part, abstracts of the title to said lands and maps showing the location of said land.

Sixth. It is the purpose of this contract to allow the parties of the second part to take the turpentine from the pine timber on said lands for three (3) consecutive years, in such locations as will be convenient for the party of the first part to cut and manufacture the pine timber so turpentined at its saw mill plant at McComb City, Mississippi, as soon after the termination of the turpentine period of three (3) years as is practicable.

Seventh. The party of the first part agrees to allow the parties of the second part and hereby conveys to them the right to erect, construct and locate stores, storehouses, turpentine distilleries and other buildings necessary to be used in gathering, storing or manufacturing the turpentine and resin products gathered from said lands on the lands owned by the party of the first part, and to remove or sell for purpose of removal of said buildings or other fixtures at or before the termination of this contract, and the party of the first part further grants unto the parties of the second part to cut wood, building and barrel timber from its said lands necessary to be used in the manufacture and barreling the turpentine or resin products that are gathered from the aforesaid land, and the rights granted in this section shall be free from cost to the parties of the second part.

*     *     *

Twelfth. The parties of the second part, their heirs or assigns shall have the right to assign or transfer this

lease, to lease or sublet the whole or any part of said timber for the whole or any part of said term to any reasonable person, firm or corporation, or to place any agent, employee or representative upon said land in the operation of such turpentine business without the knowledge or consent of the party of the first part.

Thirteenth. In consideration of the foregoing covenants and promises and the consideration paid and to be paid, the party of the first part hereby warrants and defends and will during the term of this contract and lease, warrant and defend the parties of the second part in the possession of the above-described land and premises.

In witness whereof, the parties to this contract and lease have hereunto set their hands and seals in duplicate this 24th day of October, A. D. 1905.

J. J. WHITE LUMBER COMPANY.

By J. J. WHITE, Pres. [Seal].

J. A. CARR, for CARR BROS.

Attest: H. L. WHITE, Sec.

The record in this case is voluminous, and we have given it a careful examination and patient consideration. We find it necessary, in order to properly construe the contract here, to take into consideration the circumstances and surroundings of the parties at the time the lease was agreed upon. The appellee wanted to lease the pine timber for turpentine purposes. The appellant lumber company had about eight thousand, three hundred acres of land lying scattered in two counties in this state and two parishes in Louisiana, upon which stood merchantable pine trees suitable for turpentine purposes. Mr. Carr, appellee, testified that just prior to entering into the contract:

"They represented to me that they had something like about eight thousand acres of land there in Amite and Pike counties, and in St. Helena and St. Tammany parishes, which contained something like six thousand, nine hundred acres of timber."

Appellee, Carr, drove out through the timber, inspecting it west of Osyka, in company with a timber man and engineer (Burke); and he and Burke afterwards examined the timber on the east side; that at this time appellant stated to appellee that they, appellant, had on the land "six thousand nine hundred and thirteen acres. there or thereabouts, of timber;" that appellee understood "approximately" to mean "near about;" that " 'virgin timber' is a natural forest where the timber has never been removed." The testimony introduced by appellant as to the situation and conditions immediately preceding the making of the contract tends to show in substance, that appellant intended to lease to appellee only the timber which might be on the eight thousand, three hundred acres of land, and that the six thousand, nine hundred and thirteen acres of timber was an estimate of the amount of acres of timber on the whole body of land, and, also, that the appellee's surveyor, Clark, in making his survey of the alleged shortage, wrongfully excluded from the survey certain timber included in the terms of the lease. The chancellor may have, in weighing the testimony, given only slight credence to appellant's. proof. As to this, we do not question his discretion to do so; but the testimony of appellee may be considered by us as true in construing the contract of lease. With these surroundings and circumstances, the contract was entered into, and appellee boxed the trees for turpentine purposes. for several years, until the storm of September, 1909, when all the timber was destroyed. Afterwards, this lawsuit followed.

The lower court arrived at the shortage of one thousand, four hundred and eleven acres of timber by the survey made by Clark and Ball, employed by appellee. Clark testified as to the survey, and said that he had not surveyed the timber, but surveyed the old fields and swamps, and arrived at the amount of shortage in this way; and that he surveyed and included "only virgin timber," leaving out of his survey all other timber regardless of size, or

whether or not it was merchantable pine timber suitable for turpentine purposes; and that he also left out certain timber land claimed by outside parties, the title to which is admitted in this record to be in the appellant. The whole testimony shows that there were "old field pines" and other pines that would square "more than four inches by four inches," and a large amount of timber that was not counted in the survey because it was not "virgin timber," but which was in fact merchantable pine timber, suitable for turpentine purposes. Clark further testified that he left out all 4x4 inches, square timber, unless it was "virgin timber," and that if his survey had taken in the timber in the old fields and swamps, appellee "would probably had as much as the lease called for;" that there were suitable pines in the swamps and old fields, but this was not "virgin timber." We cannot say from the whole proof in the record that the timber left out by appellee's surveyors, without authority of the contract, would not amount to one thousand, four hundred and eleven acres of merchantable pine timber suitable for turpentine purposes; and we think it would be more reasonable to conclude that the appellee's surveyor, Clark, was right when he said that, if the merchantable pine timber suitable for turpentine purposes in the old fields and swamps and on the lands claimed by outside parties, the cut-over lands, and timber squaring 4x4 inches, not "virgin timber," had been included in his survey, that appellee would have gotten all the lease called for. Now, let us look at the contract signed by all the parties to this controversy. It cannot be said to be a contract of warranty as to the quantity, but merely warrants the use and possession of the appromixated quantity covered by the lease. It is to be construed against both parties alike. We think an examination of the contract will disclose the clear intent of the parties that the timber on the eight thousand, three hundred acres of land was leased for twenty-five thousand fifteen dollars and eighty cents, and while the instrument

attempts to apportion or specify the number of acres of timber in each subdivision of land, yet this appears to be a mere estimate, and is qualified by the clause in the contract, "being in all approximately six thousand, nine hundred and thirteen acres of timbered land." "At the rate of three dollars and sixty cents per acre" is only a calculation based on the estimate of the number of timbered acres, which, when figured out, does not harmonize with the total amount of the purchase price. Appellee, Carr, testified that three dollars and sixty cents per acre was merely a basis for the lease. The appellee knew that no survey of the timbered land had been previously made by appellant, and that all parties were depending on an estimate of the timbered acreage made by Engineer Burke, as to the amount of timber on the eight thousand, three hundred acres of land.

After an exhaustive study of the contract and evidence, and the authorities bearing on the questions involved, we are firmly convinced that the able chancellor erred in his finding against appellant for the one thousand, four hundred and eleven acres under the terms of the contract in this case. There is no escape from the conclusion that the contract includes all merchantable pine timber suitable for turpentine purposes, regardless of whether it be virgin timber, cutover timber, old field timber, swamp timber, or 4x4 timber, on the eight thousand, three hundred acres of land. The surveyors Clark and Ball, for appellee, testified that they left out of their survey all of the merchantable pine timber suitable for turpentine purposes, except the "virgin timber." This was wrong. The contract does not specify "virgin timber." This being true, there was no way for the chancellor to determine, from the evidence before him, how much timber was left out by appellee's surveyors in their survey; and, being unable to say how much of the six thousand, nine hundred and thirteen acres is short, if any at all, and the burden of proof being on the complainant below to prove its case, the chancellor certainly could not rightfully decree

that there were one thousand, four hundred and eleven acres short, or that there was any shortage whatever, or if any number of acres were short, that it was such a shortage or variation as to show fraud or deception, for which the lessee may recover the purchase money from the lessor. Taking all the testimony together, and considering the contract in connection therewith, we hold that appellee, under the terms of the lease, failed to establish the shortage of one thousand, four hundred and eleven acres of timber, as he excluded in his survey certain merchantable pine timber, suitable for turpentine purposes, which is included within the terms of the lease, and this excluded timber may have amounted to one thousand, four hundred and eleven acres, or it may have amounted to enough to make the variation, if any, inconsiderable; consequently, no recovery can be had. And this is true even though the contract here be construed as a contract "in acres" and not a contract in "gross," as urged by learned counsel for appellee. *Frederick* v. *Youngblood,* 19 Ala. 680, 54 Am. Dec. 210; *Dale* v. *Smith,* 1 Del. Ch. 1, 12 Am. Dec. 64; *Estes* v. *Odom,* 91 Ga. 600, 18 S. E. 355; *King* v. *Brown,* 54 Ind. 368; *Young* v. *Craig,* 2 Bibb (Ky.) 270; *Rogers* v. *Garnett,* 4 T. B. Mon. (Ky.) 269; *Clark* v. *Scammon,* 62 Me. 47; *Hurt* v. *Stull,* 3 Md. Ch. 24; *Hall* v. *Mayhew,* 15 Md. 551; *Slothower* v. *Gordon,* 23 Md. 1; *Phipps* v. *Tarpley,* 24 Miss. 597; *Mann* v. *Pearson,* 2 Johns. (N. Y.) 39; *Ketchum* v. *Stout,* 20 Ohio, 453; *Pendleton* v. *Stewart,* 5 Call (Va.) 1, 2 Am Dec. 583; *Caldwell* v. *Craig,* 21 Grat. (Vt.) 132.

We hold, also, from the whole record in this case that the contract of lease is a contract "in gross," or "in bulk," and that no recovery can be maintained for the shortage or variation here, if any, it not amounting to deception or fraud, in the quantity of timbered land. Am. & Eng. Ency. Law, vol. 20, p. 875; *Phipps* v. *Tarpley, supra; Kerr* v. *Kuykendall,* 44 Miss. 137; *Tyson* v. *Hardesty,* 29 Md. 305; *Hurt* v. *Stull, supra; Oaks* v. *De Lancey,* 133 N. Y. 227, 30 N. E. 974, 28 Am. St. Rep. 628; *Pen-*

*dleton* v. *Stewart, supra; Melick* v. *Dayton,* 34 N. J. Eq. 245; *Wadlington* v. *Hill,* 10 Smedes & M. (Miss.) 560; *Atkinson* v. *Sinnott,* 67 Miss. 502, 7 So. 289; *Waddell* v. *De Jet,* 76 Miss. 104, 23 So. 437; *Eps.* v. *Saunders,* 109 Va. 99, 63 S. E. 428, 132 Am. St. Rep. 904; *Hodges et al.* v. *Denny,* 86 Ala. 226, 5 So. 492; 39 Cyc. 1314; *Phifer* v. *Steenburg et al,* 66 Fla. 555, 64 So. 265.

In view of these conclusions, the case is reversed as to that part of the decree for the one thousand, four hundred and eleven acres of timber, and the claim dismissed, and in all other respects is affirmed. Let all the court costs be assessed equally against appellee and appellant.

*Reversed and affirmed in part.*